GOTHARD, Judge.
Mary Jane Hunter, plaintiff herein, filed this action against Benson & Gold Chevrolet Co., Inc. and General Motors Corporation seeking redress for physical injuries and property damage she sustained in a one car accident which occurred on November 15, 1985. Ms. Hunter asserted that the accident was caused by rehibitory vices and defects in her 1983 Chevrolet Citation which were within the knowledge of General Motors but not disclosed to the plaintiff. Plaintiff further asserts that she brought her vehicle to Benson & Gold Chevrolet on three occasions to have the defects repaired to no avail.
General Motors answered the suit denying the existence of any defects or vices in the car and asserting that the legal cause of the accident was plaintiff’s intoxication.
A four day jury trial commenced on September 11, 1989. At the close of plaintiff’s *673 case, General Motors moved for a directed verdict which was granted in part and denied in part. The trial court granted the motion insofar as it pertained to the dangerous per se, the defective design and the failure to warn theory of products liability but denied the motion as to the defective construction or composition theory. A motion for directed verdict on behalf of Benson & Gold was denied. Those rulings were not appealed and the matter went to the jury, as to General Motors, solely on the issue of whether the defendant was liable under the theory that plaintiffs car was unreasonably dangerous in construction or composition at the time it left the manufacturer, making the car more dangerous than it was designed to be.
At the close of trial the jury found that the vehicle did not contain an unreasonably dangerous defect that existed at the time it left the custody and control of General Motors. Further, the jury found that, although negligence existed in the repair of plaintiffs vehicle by Benson & Gold, that negligence was not the legal cause of the accident. The negligence of the plaintiff herself was the sole legal cause of the accident, according to the jury’s findings. A judgment reflecting the jury findings was signed by the trial court and is the basis for this appeal by plaintiff. We affirm.
Plaintiff assigns five errors for our review:
1. The trial Court erred by admitting into evidence the blood alcohol test of Mary Jane Hunter.
2. The trial Court erred by not admitting into evidence photographs of other vehicles to impeach an expert witness’s direct testimony.
3. The verdict rendered by the jury was contrary to the law and evidence by not finding Benson and Gold the legal cause of the accident.
4. The verdict rendered by the jury was contrary to the law and evidence by not finding General Motors the legal cause of the accident.
5.The verdict rendered by the jury was contrary to the law and evidence by not considering the comparative fault or lack thereof by the plaintiff in arriving at its decision.
The first two assignments concern evi-dentiary rulings made by the trial court. In the first assignment the plaintiff objects to the admittance of a blood alcohol analysis taken at East Jefferson Hospital where plaintiff was taken after the accident. The analysis, which revealed that the plaintiff had a .28 blood alcohol level was part of a certified copy of plaintiffs medical records, signed by the hospital administrator and sent to the trial court in a sealed envelope in response to a subpoena duces tecum.
The document was admitted into evidence over plaintiff’s objection by authority of LSA-R.S. 13:3714 which provides:
Whenever a certified copy of the chart or record of any hospital, signed by the administrator or the medical records librarian of the hospital in question, is offered in evidence in any court of competent jurisdiction, it shall be received in evidence by such court as prima facie proof of its contents, provided that .the party against whom the record is sought to be used may summon and examine those making the original of said record as witnesses under cross-examination.
Plaintiff’s argument against the propriety of admission of the test is that no proper foundation connecting the specimen with its source was laid and, therefore, the test lacks integrity and reliability.[1] This argument is unconvincing since R.S. 13:3714 is a legislative dispensation of the foundation requirement for properly certified medical records, and is an exception to the hearsay rule. Compliance with the statute eliminates the need for a showing of chain of custody. See Aites v. State through Dept. of Transp., 512 So.2d 865 (La.App. 3rd Cir.1987), writ denied 514 So.2d 133 (La.1987); Jones v. Liberty Mutual, 568 So.2d 1091 (La.App. 5th Cir.1990). However, the evidence must also meet the relevancy requirement for admission. Kenney v. Coo *674 per, 444 So.2d 211 (La.App. 1st Cir.1983). We find that the test is relevant to the material issue of legal causation and was properly admitted into evidence.
Plaintiff also avers the trial court erred in refusing to admit into evidence certain photographs offered by plaintiff. The photographs were of certain General Motors cars with a clamp on the vacuum assist hose.
Plaintiff elicited testimony from Michael Inden, an expert witness, that there was no clamp on the vacuum assist hose in plaintiff’s car. Since one of his theories of causation of the accident was an air leak in the system, the indication of the testimony was that a clamp may have prevented such a leak.
In refuting that testimony, General Motors presented testimony from its own expert, Richard Maiers, that the fitting in question is a plastic serrated fitting which needs no clamp and, therefore, no clamp is put on the fitting.
In response, plaintiff used several photographs showing General Motors vehicles with clamps. Defense argues in brief that an objection to the use of the photos was made at the bench but withdrawn. That bench conference is not contained in the record. When plaintiff sought to introduce the photographs into evidence, defense re-urged the objection based on the fact that the photographs were unauthenticated, irrelevant and not included on the pre-trial order. The trial court sustained the objection.
There is no authentication of the photographs in the record. It is unknown when the photos were taken and whether the clamps were installed by the manufacturer or some other party. Since the photographs were not proffered, and they are not before us, it is impossible to conclude whether they fairly depict what the plaintiff maintains they depict.
Moreover, since the question of defect in design and manufacture was no longer at issue in the trial, we believe the photographs were of questionable relevancy. See LSA-C.E. Art. 402.
Even assuming arguendo that the photographs were admissible, their exclusion is not error since there is no showing that the exclusion affected a substantial right of the plaintiff. LSA-C.E. Art. 103 A.
The remaining three assignments of error question the jury’s findings of legal causation and liability in the matter. The standard for review in such matters is clearly set out in Rosell v. ESCO, 549 So.2d 840, 844 (La.1989) as follows:
It is well settled that a court of appeal may not set aside a trial court's or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
The plaintiff testified that she left the Winn Dixie on Williams Boulevard in Ken-ner where she was working as a display model at about 8:00 or 8:30 p.m. on November 15, 1985. She went to Bennigan’s which is located on Veterans Highway to get a salad to take home for dinner. While she was waiting for the salad to be prepared she drank one glass of wine.[2] She left Bennigan’s with the salad and a second glass of wine, both in take out containers. Ms. Hunter turned on to Veterans Highway and proceeded in an easterly direction. She attempted to make a U-turn on Veterans to get back to Williams. Ms. Hunter testified that, at this point her car began to make noises and “just went out of control. It went crazy.” The car jumped over the neutral ground and went across the eastbound lanes of Veterans, through a wooden fence on the side of the road and into the north wall of the Piccadilly Cafeteria.
Ms. Hunter testified that throughout the ordeal she alternated her foot from the accelerator to the brake in an effort to *675 regain control of the car. She further testified that, when she went through the fence she realized she could not control her car and a collision with the brick wall of the cafeteria was imminent, she unhooked her seatbelt and laid across the front seats.
Ms. Hunter testified that she did not like the ear from the time she purchased it. She said the car would “jump” when she shifted the transmission from park to reverse making it necessary for her to depress the brake. She also asserted that the shift indicator would occasionally go into neutral from the drive position. Shortly before the accident she claimed to have trouble with the car stalling. She testified that she brought the car in to Benson and Gold on several occasions with these complaints and had, in fact, brought the car in on the morning of the accident but was told by Benson employees to return with the car on Monday for repairs.
On cross examination Ms. Hunter admitted that she never had problems with the brakes or with the accelerator sticking. She admitted that her only real problem was that the shift indicator would slip from drive into neutral. When asked if this ever happened in traffic she gave conflicting testimony, admitting finally that she really didn’t remember. When asked if she ever had trouble with the shift slipping in any other gear, she answered that she could not remember. After some confusing testimony, Ms. Hunter admitted that after the second time she brought the car to Benson she had no further trouble with the car slipping from drive to neutral since it was explained to her that the stickers marking the gears were slightly misaligned. After that repair she learned to shift the car properly and had no further trouble. When asked if the car would speed up on those occasions when the shift would slip from drive to neutral, Ms. Hunter testified that she could not remember.
Plaintiff also presented evidence from Raymond Millet, an officer in the traffic division with the Jefferson Parish Sheriff’s Office, that he investigated the accident. Officer Millet, who is experienced in the arrest and apprehension of DWI offenders, testified that he arrived on the scene after Ms. Hunter had been removed. He checked the accident scene, but did not notice the odor of alcohol in the car. He charged Ms. Hunter with failure to maintain control of her vehicle in a U-turn after concluding that she passed out at the wheel. Fred Falgout, Officer Millet’s supervisor, testified that he looked into the passenger compartment of the ear and observed that it was in disarray and although he detected the smell of alcohol, there was no arrest made for driving while intoxicated.
Louis Malinary, an officer with the Ken-ner Police Department arrived on the scene before the Jefferson Parish police officers. He testified that he observed Ms. Hunter lying down on the front seat. After he ascertained that an ambulance was in route he went to the passenger side of the car. He saw food strewn all over the interior. He stated that he did not get inside of the car and did not smell alcohol. After Ms. Hunter was taken out of the vehicle by emergency medical personnel, Officer Mali-nary recognized her as a teacher who had instructed his son at Bonnabel High School.
One eye witness to the accident testified by deposition that she was east bound on Veterans when she saw plaintiff’s car come off the neutral ground and across the lanes of Veterans. That witness, Stephanie Swanson, testified that plaintiff’s car was going about 40 miles per hour. She further testified that the car appeared to go smoothly, with no jerking motions observed, which indicated to Ms. Swanson that the plaintiff did not apply the brakes.
Plaintiff also presented evidence from an expert witness, Michael Inden, who opined that the accident could have happened because the cable which connects the shift to the transmission was misaligned. That fact combined with a high idle could have caused the car to jerk forward. He also stated he believed there to be an air leak in the intake system around the carburetor. However, Mr. Inden admitted he only saw the car once for about twenty minutes and conducted no tests on the car other than to attempt to manually move the gear shift.
*676 General Motors presented several witnesses in its defense.
Aaron Millett, Jr., an emergency medical technician who attended Ms. Hunter at the scene of the accident, testified that he smelled alcohol on the plaintiffs breath and noted that fact on his report which was made a part of the record. He also stated that she was arrogant and uncooperative.
Michael Danton, the manager of the Piccadilly Cafeteria, testified that he proceeded immediately to the car after its impact with the cafeteria. He observed the plaintiff lying between the seat and the dashboard. He observed an order of food smashed over the front part of the floorboard and detected a distinct smell of alcohol. On closer examination Mr. Danton saw a styrofoam “go-cup” containing a small amount of reddish colored liquid which appeared to be an alcoholic beverage.
Dr. Frank Wilson, the emergency room doctor at East Jefferson Hospital who treated Ms. Hunter, testified by deposition that he ordered a blood alcohol level test because the patient showed signs of mental impairment and her breath smelled of alcohol. Dr. Wilson testified that the test was necessary to determine whether the impairment was due to intoxication or head injury. The test confirmed Dr. Wilson’s clinical observation of the patient and an indication that the patient was intoxicated was made in the diagnosis part of the medical report. It was ultimately ascertained that Ms. Hunter sustained numerous facial lacerations, but no head injury.
Cathy Buhler, a nurse at East Jefferson General Hospital, testified that she attended to Ms. Hunter after her arrival at the hospital. Ms. Buhler testified that she smelled alcohol on Ms. Hunter’s breath and made that entry on Ms. Hunter’s chart at 11:35 p.m. After being shown a statement at the bottom of a pathology laboratory summary which stated, “False evaluation may be isopropyl alcohol,” Ms. Buhler explained that that statement is reflected on all such summaries. Ms. Hunter was subsequently stabilized and transferred to Charity Hospital because she had no insurance.
Dr. Thomas Gilchrist, an expert in the field of forensic pathology, testified as a witness for the defense. He reviewed the blood test made on Ms. Hunter and explained that a blood test done on plasma, which contains more water, would indicate a somewhat higher level of alcohol than a test done on a specimen of whole blood. Since hospital tests are normally done on plasma, Dr. Gilchrist adjusted the blood alcohol level to .23 for purposes of his evaluation of Ms. Hunter’s condition.
Even at a level of .23, which Dr. Gilchrist described as a high level of alcohol in the blood, a person would experience loss of judgment and ability of their senses. As the doctor explained, “The visual acuity is decreased and you cannot see as well. The eyes do not converge to work as well, which causes loss of depth perception.” A person would also experience a loss of motor control and coordination. Dr. Gilchrist estimated reaction time would be increased by 200 percent in an individual with this alcohol level.
By comparison levels of .3 to .35 would likely cause unconsciousness and .4 is the usual lethal level. Certainly, Dr. Gilchrist opined, a person with a .23 level would be in no condition to operate an automobile.
Dr. Gilchrist explained that ethyl alcohol is the type contained in alcoholic beverages and isopropyl alcohol is rubbing alcohol, often used as a standard procedure, in wiping the arm before drawing blood. He testified that he did not believe isopropyl alcohol used in this manner would affect the accuracy of the blood test.
The defense offered testimony from Richard Maiers, an expert in the field of automotive engineering, to refute the claims of plaintiff’s expert, Mr. Inden. Mr. Maiers testified that he examined the vehicle on two occasions. When he tested the car only two wheels remained intact, the others having been sold for parts by the salvage yard. He stated he tested the brakes on these wheels and they performed normally. He found no evidence of an air leak in the system nor any malfunction in *677 the acceleration system, although the carburetor was frozen from lack of use and damage sustained in the accident.
Defendant Benson & Gold offered the service record of plaintiffs vehicle into evidence. It indicates the car, which was purchased in April, 1984 was brought in for service on three occasions. On February 14, 1985 where the complaint was that the transmission “pops out of drive.” On March 6, 1985 the floor shift cable was replaced and there is a notation to check a “high idle.” The final report dated April 12, 1985 indicates Ms. Hunter’s complaint was that the car “kills when accelerating.” There is nothing in the record to support or refute plaintiffs claim that she brought the car in for service on the date of the accident.
The findings in this case are based largely on determinations of credibility of witnesses, matters which demand affording great deference to the trier of fact. Canter v. Koehring, 283 So.2d 716 (La.1973). A factual finding based upon a credibility determination can virtually never be manifestly erroneous or clearly wrong unless documentary or objective evidence contradicts a witness’ story or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.
Given the circumstances of this case and the evidence presented to the jury we do not find manifest error in the finding that defendant’s negligence was the sole legal cause of the accident. A reasonable person could deduce from the evidence that Ms. Hunter’s level of intoxication was such that she was unable to control her automobile and that single fact was the legal cause of the accident. Since the findings are reasonable in light of the entire record, this court may not reverse the trier of fact. Rosell v. ESCO, supra.
For these reasons we affirm the judgment below at appellant’s cost.
AFFIRMED.

. At trial plaintiff stipulated to the authenticity of the remainder of the hospital record.

. Ms. Hunter had denied consuming any alcohol in a deposition taken earlier; but stated she subsequently remembered that she did drink one glass of wine.